## STATE OF CONNECTICUT *v.* MICHAEL A. YOUNG
### (AC 16090)

O'Connell, C. J., and Spear and Hennessy, Js.[1]

Argued March 16, 1999—officially released May 9, 2000

[1] The listing of judges reflects their seniority status on this court as of the date of oral argument.

*Susan M. Hankins*, assistant public defender, with whom were *Stephanie Sweeny* and *Janice Wolf*, certified legal interns, and, on the brief, *Michael Tortora* and *Michael O'Donnell*, certified legal interns, for the appellant (defendant).

*Ronald G. Weller*, assistant state's attorney, with whom, on the brief, were *Patricia A. Swords*, state's attorney, and *Nina Rosen*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

SPEAR, J. The defendant, Michael A. Young, appeals from the judgments of conviction, rendered after a jury trial, of three counts of criminal violation of a protective order in violation of General Statutes § 53a-110b and one count each of breach of the peace in violation of General Statutes § 53a-181 (a) (2), disorderly conduct in

violation of General Statutes § 53a-182 (a) (1), reckless endangerment in the second degree in violation of General Statutes § 53a-64 and criminal mischief in the third degree in violation of General Statutes § 53a-117 (a) (1) (A). The defendant claims that the trial court improperly (1) instructed the jury that the defendant's failure to produce a certain witness permitted the jury to infer that the witness' testimony would have been adverse to the defendant,[2] (2) precluded evidence of the victim's prior misconduct, (3) admitted evidence of a telephone conversation without a proper evidentiary foundation, (4) precluded the defendant from impeaching the victim regarding an alleged act of fraud and (5) allowed the state to impeach the defendant's character with misconduct evidence. We reverse one of the judgments because the now improper missing witness information harmed the defendant.

The jury reasonably could have found the following facts. On August 18, 1994, the court issued a protective

[2] This claim is based on the "missing witness rule" of *Secondino* v. *New Haven Gas Co.*, 147 Conn. 672, 165 A.2d 598 (1960), wherein, under certain circumstances, the trier of fact is allowed to draw an adverse inference from a party's failure to produce a witness or witnesses. The rationale and requirements for a missing witness instruction are well known. "The failure to produce a witness for trial who is available and whom a party would naturally be expected to call warrants an adverse inference instruction against the party who would be expected to call that witness. . . . [T]he two requirements for a *Secondino* adverse inference instruction against a party are that the witness: (1) is available; and (2) could reasonably be expected, by his relationship to the party or the issues, to have peculiar or superior information material to the case that, if favorable, the party would produce. . . . The party seeking the adverse inference instruction bears the burden of proving both prongs of the test, and the trial court must make a preliminary determination that there is evidence in the record to support these elements. . . . Whether a party has established the requirements for a *Secondino* instruction is a factual determination that is committed to the sound discretion of the trial court." (Citations omitted; internal quotation marks omitted.) *State* v. *Lewis*, 245 Conn. 779, 813–14, 717 A.2d 1140 (1998).

The defendant also claims that the court improperly allowed the state to argue the missing witness inference to the jury. This claim is subsumed in our discussion of the propriety of the instruction itself.

order prohibiting the defendant from having any contact with the victim, Brandis Breedlove. The order remained in effect until January 11, 1996. The defendant was involved in three separate incidents that resulted in three judgments of conviction.

The first incident occurred on August 4, 1995. The defendant knocked on Breedlove's door at approximately 1 a.m. Breedlove refused to let him into her home. The defendant then went to Breedlove's car and started pulling out wires from the engine. Breedlove told the defendant that she was going to call the police and the defendant left. Breedlove then called the police and reported the incident. Shortly thereafter, the defendant called Breedlove and inquired about the whereabouts of the police. Breedlove told him that the police had been called and were on their way.

State Trooper Jack Richard Sauve arrived at the scene and began taking Breedlove's statement. The telephone rang and Breedlove answered. She told Sauve that the defendant was on the telephone and handed the telephone to him. Sauve said, "Michael, this is Trooper Sauve. Where are you?" The defendant replied, "I'm around. Why do you want to know?" At no point did the caller deny being the defendant. Initially, Breedlove did not sign the statement prepared by Sauve. Three weeks later she contacted Sauve and signed the statement, alleging that the defendant had continued to harass her.

The second incident occurred on November 25, 1995. Breedlove and Robert Cormier were at a bar in Stafford. As they were leaving, the defendant and a friend, Lanny Martin, arrived at the parking lot in the defendant's car. The defendant got out of the car, walked to Breedlove, spit on her, pushed her to the ground and then started fighting with Cormier. The fight was broken up by patrons of the bar. Breedlove and Cormier got into Breedlove's car and drove away.

As they were driving home, Breedlove noticed that the defendant was following her. The defendant rammed his car into her car from behind five or six times at a speed of approximately forty-five miles per hour. Breedlove stopped her car and got out. The defendant and Martin got out of the defendant's car, and the defendant started toward Cormier. Breedlove intervened and the defendant hit her with a closed fist. He then picked up Breedlove by her hair and dragged her down the road. While this was taking place, Martin held Cormier back by brandishing a broken beer bottle. Breedlove managed to get back into her car, at which point the defendant kicked in the driver's side window. Breedlove received cuts on her forehead, nose and lower lip. She also had bruises on her cheek and mouth from being hit, and was left with a bald spot where her hair was pulled out.

The third incident occurred on November 30, 1995. The defendant telephoned Breedlove at home approximately fifteen times and drove by her home later that night. The defendant was charged in a separate information stemming from each incident. We affirm the judgments of conviction that were based on the first and third incidents (Docket Nos. CR 95-58530 and CR 95-59206) and reverse the judgment of conviction that was based on the second incident (Docket No. CR 95-59207).

I

The defendant first claims that the court improperly instructed the jury, and allowed the state to argue, pursuant to *Secondino* v. *New Haven Gas Co.*, 147 Conn. 672, 675, 165 A.2d 598 (1960), that the jury could infer from the defendant's failure to call Martin as a witness to the November 25 incident that Martin's testimony would have been unfavorable to the defendant. We agree.

The defendant and Martin were charged as codefendants as a result of the events that occurred on November 25, 1995. They were tried separately and, at the time of the defendant's trial, Martin's case was pending. At the defendant's trial, State Trooper Colleen Anuszewski testified that she had seen Martin the day before and that he could be located in Hartford. On cross-examination, the defendant testified that Martin was a friend and the defendant knew where he could be located.

At the close of all of the evidence but prior to summation, the state filed a request for a *Secondino* missing witness instruction to be given to the jury. The defendant objected and made an offer of proof outside the presence of the jury. Defense counsel offered the testimony of Phillip N. Armentano, an attorney for Martin in his pending criminal trial. Armentano testified that if Martin were to take the witness stand, he would advise him to invoke his fifth amendment privilege against self-incrimination. The court concluded that the privilege was personal to Martin and overruled the objection. The court found that Martin was available and that he was a witness whom the defendant naturally would be expected to call to testify. The court refused to speculate as to whether Martin would invoke his fifth amendment privilege and granted the state's request for the *Secondino* instruction.

After this appeal was argued, our Supreme Court decided *State* v. *Malave*, 250 Conn. 722, 737 A.2d 442 (1999) (en banc), cert. denied, 528 U.S. 1170, 120 S. Ct. 1195, 145 L. Ed. 2d 1099 (2000), in which the court abandoned the missing witness doctrine of *Secondino* v. *New Haven Gas Co.*, supra, 147 Conn. 672. The defendant's conviction in *Malave* was affirmed because the Supreme Court concluded that the *Secondino* instruction constituted harmless error under the circumstances of that case. *State* v. *Malave*, supra, 743.

We ordered the parties to file supplemental briefs addressing two questions: (1) "Does *State* v. *Malave,* [supra, 250 Conn. 722], apply to this case and require us to conclude that the *Secondino* instruction was improper?" and (2) "If the *Secondino* instruction was improper, has the defendant met his burden of showing harm under either or both of the standards set out in *State* v. *Malave* [supra]?" Thereafter, this court addressed the first question. In *State* v. *Bailey,* 56 Conn. App. 760, 762, 746 A.2d 194 (2000), and *State* v. *Quinones,* 56 Conn. App. 529, 533, 745 A.2d 191 (2000), we held that *Malave* applies retroactively. Although *Bailey* and *Quinones* involved claims that the court improperly refused to give *Secondino* instructions, the rationale of *Quinones* applies with equal force here, where the court gave a *Secondino* instruction.

"In *Malave,* our Supreme Court abandoned the *Secondino* rule in criminal cases. The *Malave* decision applies retroactively to this case because so doing will not produce substantial inequitable results and because our Supreme Court did not stipulate that the *Malave* decision should apply prospectively only. See *Marone* v. *Waterbury,* 244 Conn. 1, 10, 707 A.2d 725 (1998) ('judgments that are not by their terms limited to prospective application are presumed to apply retroactively'); *Neyland* v. *Board of Education,* 195 Conn. 174, 180, 487 A.2d 181 (1985) (where retroactive application of decision could produce substantially inequitable results, injustice or hardship may be avoided by holding of nonretroactivity). When our Supreme Court has intended a decision to apply prospectively only, it knows how to say so clearly. *State* v. *Delvalle,* 250 Conn. 466, 475–76, 736 A.2d 125 (1999) ('we . . . direct our trial courts to refrain from using the [jury instruction at issue in that case] in the future' . . . ); *State* v. *Troupe,* 237 Conn. 284, 305, 677 A.2d 917 (1996) (en banc) ('rule that we announce today will apply only to . . . [testimony admitted after] the date of the publica-

tion of this opinion'); *State* v. *Brown*, 235 Conn. 502, 526, 668 A.2d 1288 (1995) ('we now hold that henceforth a trial court must [follow the announced rule]' . . . )." *State* v. *Quinones*, supra, 56 Conn. App. 533.

Applying *Malave* here "will not produce substantially inequitable results" because the only person who relied on the *Secondino* instruction was the prosecuting attorney. The principle that retroactivity should be denied unless it causes unfairness or undue hardship applies "to a *party's* conduct, not to an attorney's strategy." (Emphasis in original; internal quotation marks omitted.) *George* v. *Ericson*, 250 Conn. 312, 326, 736 A.2d 889 (1999). We now turn to the question of whether the *Secondino* instruction harmed the defendant.

In *State* v. *Malave*, supra, 250 Conn. 741, our Supreme Court acknowledged that the standard for establishing harm had not been articulated consistently in the court's prior decisions. "One line of cases states that the defendant must establish that it is more probable than not that the erroneous action of the court affected the result. . . . Another line of cases states that the defendant must establish that the trial court error caused him substantial prejudice." (Citations omitted; internal quotation marks omitted.) Id. The Supreme Court did not view *Malave* as an appropriate vehicle for clarifying the harm question because neither formulation of harm was satisfied in *Malave*. We are not hampered by this lack of resolution because we conclude here that both formulations, if they are indeed functionally different, are satisfied.

Breedlove's credibility was critical to the state's case as to the charges stemming from the November 25, 1995 incident. Three of the four potential witnesses, Breedlove, Cormier and the defendant, testified. The prosecuting attorney could have been almost certain that Martin would not testify because he was a codefen-

dant whose case was still pending at the time of the defendant's trial. At the same time, the prosecutor was able to obtain a missing witness instruction that allowed the jury to infer that Martin's testimony would have been unfavorable to the defendant even if, as the defendant contends, Martin had in fact given a statement that was favorable to the defendant. As defense counsel aptly puts it, "This improper *Secondino* instruction filled in evidentiary gaps and made two shaky witnesses . . . into three against one." The state took full advantage of the instruction in closing argument by repeatedly referring to Martin's absence.[3]

We are aware that the *Malave* court did not "prohibit counsel from making appropriate comment, in closing arguments, about the absence of a particular witness, insofar as that witness' absence may reflect on the weakness of the opposing party's case." Id., 739. The *Malave* court went on to state that such comment is permissible "[s]o long as counsel does not directly exhort the jury to draw an adverse inference by virtue of the witness' absence . . . ." Id. While the prosecuting attorney did not directly ask the jury to draw such an adverse inference here, the argument, coupled with the court's instruction that such an inference was permissible, constitutes the harm.

---

[3] The prosecutor argued: "And I ask you ladies and gentlemen, where is Lanny Martin? Lanny Martin was the other person that was at that scene, and he is a friend of this [defendant]. Why isn't he here to testify? Why didn't the defendant call him and put him on the stand? Why do you think, ladies and gentlemen, that didn't happen? . . .

"That is also a lame excuse. And where is Lanny Martin to confirm all this, I would like to know. Where is he? He is [the defendant's] friend."

The prosecutor continued in this vein in her rebuttal argument:

"And, once again, I ask you, where is Lanny Martin? [The defendant's] friend, Lanny Martin, who was there and saw everything. He was holding the bottle to, broken bottle to [Cormier]. . . . Why isn't he here to testify to tell us what happened? He is [the defendant's] friend. And the state is not only relying on Brandis Breedlove's testimony. The state has Rob Cormier's testimony."

Because it is highly unlikely that the defendant could have obtained Martin's testimony because of his fifth amendment privilege, the defendant was powerless to contest the potential inference. This is unlike the situation in *Malave*, where the jury was aware of the defense investigator's unsuccessful attempt to find and subpoena the missing witness. In addition, the jury in this case acquitted the defendant of the charges of assault in the third degree and threatening, which also arose out of the events of November 25, 1995. This indicates that Breedlove's testimony was not accepted totally. The jury also heard Cormier testify that he was intoxicated at the time of the events that he testified about. This state of the evidence, coupled with the state's heavy reliance on the missing witness inference in its arguments to the jury, leads us to conclude that it is more probable than not that the now erroneous instruction affected the result and caused the defendant substantial prejudice.

This conclusion requires reversal of the judgment of conviction arising out of the events of November 25, 1995. We will address the defendant's second claim, that by precluding evidence of Breedlove's misconduct, the court infringed on the defendant's constitutional right to present a defense. We also will review those claims that relate to the two judgments of conviction that we affirm. We do not address whether the court improperly allowed the state to impeach the defendant with evidence of his prior arrests and misconduct. The defendant testified as to the November 25, 1995 incident only and invoked his privilege against self-incrimination as to the other two charged offenses. He was not impeached as to the offenses stemming from the August 4 and November 30, 1995 incidents, and this issue is unlikely to arise in the new trial concerning the November 25, 1995 incident.[4]

---

[4] Under cross-examination by the state, the defendant volunteered that the police "arrest me for things I don't do." Over the defendant's objection,

## II

The defendant claims that the court improperly excluded evidence of Breedlove's previous assaultive conduct toward the defendant because the rulings infringed on his constitutional right to present a defense. We disagree.

The defendant sought to introduce evidence that Breedlove (1) contacted him after obtaining the protective order, (2) attacked him on several occasions when she was jealous and (3) told his mother that she was going to make sure that he went to jail. The defendant claims that this evidence was relevant to refute the state's evidence that Breedlove suffered from battered woman's syndrome,[5] to establish her bias against the defendant and to bolster his claim of self-defense.

We note that "[r]obing garden variety claims [of an evidentiary nature] in the majestic garb of constitutional claims does not make such claims constitutional in nature. . . . Moreover, our Supreme Court has clearly stated that the right to present a defense does not include the right to offer evidence that is incompetent, irrelevant or otherwise inadmissible. . . . Every evidentiary ruling that denies a defendant a line of inquiry to which he thinks he is entitled is not constitutional error. [Here] the defendant has put a constitutional tag on a nonconstitutional claim. . . . Putting a constitutional tag on a nonconstitutional claim will no more change its essential character than calling a bull a cow will change its gender." (Citations omitted; internal quo-

---

the state was allowed to pursue the number and nature of the arrests. We do not know whether the defendant will testify in the new trial, but if he does, it seems unlikely that he would again open the door to this line of questioning by volunteering information about his past arrest.

[5] The state offered evidence of battered woman's syndrome to explain why Breedlove recanted certain statements and said that the defendant had done nothing. The state's expert explained that battered women often withdraw complaints out of fear or to minimize the situation.

tation marks omitted.) *State* v. *Jones*, 46 Conn. App. 640, 646, 700 A.2d 710, cert. denied, 243 Conn. 941, 704 A.2d 797 (1997).

The court's rulings were based on its application of the rules of evidence and did not violate the defendant's rights. To hold otherwise would mean that the court would have to admit all evidence proffered by a defendant in a criminal case, even if improper under the rules of evidence, lest the court violate the defendant's constitutional right to present a defense. *State* v. *Jones*, supra, 46 Conn. App. 646, prohibits such transformation of evidentiary claims into constitutional ones.

Moreover, the jury heard evidence of the defense because the defendant testified that Breedlove was the aggressor and had assaulted him in the past, and another defense witness was allowed to testify about Breedlove's fighting another person. We note also that the court charged the jury on self-defense and that the jury acquitted the defendant of the assault charge. We conclude that the court did not infringe on the defendant's constitutional right to present a defense.

With respect to the evidentiary claims that are relevant to the two judgments of conviction for violating the protective order that we do not reverse, we first set forth our standard of review. "The trial court is given broad discretion in determining the relevancy of evidence and its decision will not be disturbed absent a clear abuse of that discretion. *State* v. *Holliman*, 214 Conn. 38, 50, 570 A.2d 680 (1990)." (Internal quotation marks omitted.) *State* v. *Weber*, 31 Conn. App. 58, 65, 623 A.2d 506, cert. denied, 226 Conn. 908, 625 A.2d 1379 (1993).

The defendant claims that Breedlove's action in contacting him after the protective order was issued should have been allowed into evidence. We fail to see the relevance of such evidence where it was not related

to the two dates on which the defendant committed violations of the protective order.[6] With respect to the defendant's claim that the proffered evidence refuted the state's claim that Breedlove suffered from battered woman's syndrome, evidence of such seemingly contradictory conduct by Breedlove would bolster, rather than refute, the existence of the syndrome. Thus, the defendant was not harmed by the court's proper exercise of its discretion to preclude such evidence.

Finally, Mary Dolloff, the defendant's mother, proffered testimony outside the presence of the jury that Breedlove had told her that Breedlove was going to make sure that the defendant went to jail. The court precluded this evidence because there was no indication that Breedlove was going to lie to accomplish that purpose. Although the defendant asserts that this evidence was relevant to bias and motive to testify, we cannot conclude that the court abused its discretion in precluding the evidence. In and of itself, Breedlove's desire to see the defendant punished for violating the protective order was not indicative of bias or an improper motive.

### III

The defendant next claims that, with respect to the August 4, 1995 incident, the court improperly admitted hearsay testimony about Trooper Sauve's telephone conversation with the defendant because the state did not lay a proper foundation. We disagree.

The defendant objected to the admission of evidence about this conversation on the grounds of hearsay, prejudice and lack of foundation. The court overruled the

---

[6] Although the defendant argues in his brief that evidence of such contacts contradicted Breedlove's testimony that she did not contact the defendant while the protective order was in effect, the record does not indicate that this claim was made to the trial court. We are not required to review claims that were not distinctly raised in the trial court. See Practice Book § 60-5.

objection, finding a sufficient foundation on the basis of the following facts. Breedlove testified that the defendant had been at her residence and had left when she told him that she had called the police. Several minutes later, she received a telephone call. Sauve addressed the caller as "Michael" and, after identifying himself, asked, "Where are you?" The caller did not deny that he was Michael and responded, "I'm around. Why do you want to know?"

"Communications offered over the telephone may be authenticated by circumstantial evidence, if the party calling, in addition to stating his identity, relates facts and circumstances that, taken with other established facts, tend to reveal his identity." *State* v. *Berger*, 249 Conn. 218, 233–34, 733 A.2d 156 (1999). On the basis of the foregoing facts and inferences therefrom relied on by the court, we conclude that the court did not abuse its discretion in finding sufficient authentication to admit the challenged conversation.

Once the proper authentication had been established, the court properly admitted the evidence as nonhearsay. First, "[h]earsay has long been defined as an out-of-court statement that is offered to establish the truth of the facts contained in the statement. See *State* v. *Sharpe*, 195 Conn. 651, 661, 491 A.2d 345 (1985); *Murray* v. *Supreme Lodge, N.E.O.P.*, 74 Conn. 715, 718, 52 A. 722 (1902)." *State* v. *Jurgensen*, 42 Conn. App. 751, 755, 681 A.2d 981, cert. denied, 239 Conn. 931, 683 A.2d 398 (1996). "If the substance of the conversation was sought to be admitted not for the truth of its content, but to establish that the conversation itself had taken place, it is not hearsay. *State* v. *Miller*, 154 Conn. 622, 629, 228 A.2d 136 (1967)." *State* v. *Watley*, 195 Conn. 485, 490, 488 A.2d 1245 (1985).

The challenged statement was not offered for the truth of the matter asserted, namely, that the defendant

"was around," but to prove that the call was made. As such, it was not hearsay and was properly admitted.

## IV

The defendant next claims that the court improperly precluded him from impeaching Breedlove with alleged acts of fraud. We are unpersuaded.

Prior to trial, the state filed a motion in limine to prevent the defendant from making reference to Breedlove's occupation as an exotic dancer on the grounds that it was irrelevant and prejudicial. The defendant wanted to impeach Breedlove's veracity through cross-examination about her alleged receipt of state public assistance benefits while she was employed. Defense counsel learned of this alleged impropriety from the defendant, Breedlove's former boyfriend. The court granted the motion in limine.

The defendant attempts to transform this claim into one of constitutional magnitude, but it does not even rise to the level of evidentiary error. Defense counsel relied solely on his claim that "a couple of parties," including the defendant, had informed him that Breedlove had collected welfare benefits while she was working as an exotic dancer. He offered no evidentiary foundation for the questions and failed to conduct a voir dire of Breedlove outside the presence of the jury to establish a proper foundation. The court properly refused to allow the defendant to pursue this line of questioning.

The judgment in Docket No. CR 95-59207[7] is reversed and the case is remanded for a new trial on that informa-

---

[7] In Docket No. CR 95-59207, the defendant was convicted of criminal violation of a protective order in violation of § 53a-110b, breach of the peace in violation of § 53a-181 (a) (2), disorderly conduct in violation of § 53a-182 (a) (1), reckless endangerment in the second degree in violation of § 53a-64 and criminal mischief in the third degree in violation of § 53a-117 (a) (1) (A).

tion. The judgments in Docket Nos. CR 95-58530 and CR 95-59206 are affirmed.

In this opinion the other judges concurred.